UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

Case No. 14-CR-20197-UNGARO

v.

HECTOR MARIO URDINOLA ALVAREZ,
    a/k/a "Chicho," et. al.

Defendants.

_____/

AFFIDAVIT IN SUPPORT OF EXTRADITION

I, Peter J. Maynard, being duly sworn, depose, and state:

1. I am a citizen of the United States and a resident of the State of Florida.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) in Miami, Florida. I have been employed as a Special Agent by the DEA for four years.

3. The DEA is one of the agencies within the United States government responsible for the enforcement of federal narcotics laws. As an agent with the DEA, I have personally conducted and participated in numerous investigations that have resulted in the arrests and convictions of people responsible for trafficking in narcotics.

4. Based on my training and experience as an agent with the DEA, I am familiar with the means and methods that narcotics traffickers use to import illicit drugs, and I am familiar with the support and assistance that narcotics organizations require to conduct their

1

illegal activities. I have also become knowledgeable about the criminal statutes of the United States, and the federal narcotics statutes in particular.

5. In the course of my official duties, I have become familiar with the charges and evidence against Hector Mario Urdinola-Alvarez, a.k.a. "Chicho" (Urdinola), in the case entitled, <u>UNITED STATES OF AMERICA vs. HECTOR MARIO URDINOLA-ALVAREZ, a/k/a "Chicho," et. al.</u>, Criminal Number 14-CR-20197-UNGARO, which arose out of an investigation into a drug trafficking organization that imported large quantities of cocaine into the United States.

### I. Background

6. This investigation began in April 2011 when Colombian and U.S. law enforcement agents targeted a Colombia-based drug trafficking organization (DTO) that was seeking transportation services for multi-kilogram quantities of cocaine. During the investigation, confidential sources (CS's) were able to infiltrate the DTO by posing as cocaine transporters.

7. The investigation has revealed that Urdinola, Custio Enrique Simancas-Castro (Simancas), Eduardo Martinez-Meyer (Martinez-Meyer), and Edelman Morgfoy-Margfoy (Margfoy) were members of the DTO, and that between April 2011 and February 2012, they conspired to import multi-kilograms of cocaine from South America through Mexico, for ultimate distribution into the United States. Urdinola was a leader within the DTO, one of its enforcers, as well as an investor in the organization's drug smuggling ventures. Simancas was an enforcer for the DTO, Martinez-Meyer was a drug transporter, and Margfoy worked as a drug broker on behalf of the organization.

8. The DTO has further been identified as being responsible for the killing of a confidential source that worked with law enforcement in connection with this investigation.

9. Evidence has been collected through lawful, judicially-authorized telephone interceptions, physical surveillance, and the use of undercover officers and confidential sources.

## II. Evidence

10. In the spring of 2011, Margfoy and others had preliminary discussions with two confidential sources, CS-1[1] and CS-2, regarding the potential transportation of large amounts of cocaine from Colombia to Mexico.

11. In October 2011, CS-1 and CS-2 met on various occasions with Margfoy and others to negotiate the transportation of a large shipment of cocaine from Colombia to Mexico, with the eventual destination being the United States. As part of the deal, CS-1 and CS-2 indicated they had access to a vessel docked in Cartagena, Colombia, at the port of Astivik. CS-1 and CS-2 offered to use the vessel to transport narcotics for Margfoy, and informed him that their fee for doing so would be $1,200 per kilogram of cocaine transported. The initial negotiation was for the transportation of approximately 500 kilograms of cocaine. A co-conspirator present during the various negotiating sessions indicated he represented several investors who, if the deal went through, would be co-owners of the drug load. Margfoy agreed to present the deal to his boss.

12. Margfoy, accompanied by a co-conspirator, met with CS-2 a few days later and told CS-2 that Margfoy's boss was interested in the drug deal, but insisted that the offer be exclusive to them. CS-2 agreed and informed CS-1 of the same.

13. Shortly thereafter, on October 13, 2011, Margfoy, CS-1, and others met in

---

[1] As described in more detail in this affidavit, CS-1 was murdered on November 25, 2011 by members of the DTO.

Cartagena. Colombian law enforcement agents conducted surveillance of the meeting and were able to obtain a number of photographs of these individuals during the meeting.

14. CS-1 was debriefed by U.S. law enforcement agents after the meeting and stated that the purpose of it had been for Margfoy to introduce some of his co-conspirators to CS-1. CS-1 told law enforcement that during the meeting, CS-1 reiterated the terms of the transportation deal previously described to Margfoy and reaffirmed that the vessel identified could be used to transport cocaine to the United States. CS-1 indicated that those present agreed that the drug load would consist of between 400 and 500 kilograms of cocaine. Some of the co-conspirators present at the meeting told CS-1 that the cocaine was already in Cartagena and ready for transport.

15. Two of the investors in the drug venture met a short time later and discussed the logistics for the shipment of the cocaine on the vessel being offered by CS-1 and CS-2. Subsequent to that meeting, one of the investors confirmed his agreement to purchase and invest in 200 kilograms of the 400 to 500 kilograms of cocaine being shipped.

16. On October 20, 2011, CS-1 was contacted by one of the investors and was told that certain individuals would soon be arriving to inspect the boat docked at Astivik port.

17. On October 21, 2011, surveillance was set up outside the port, as well as a police checkpoint on the only exit road leading away from the port. The two individuals were observed with CS-1 and CS-3 inspecting and videotaping the vessel at the port.

18. After leaving the boat yard on October 21, 2011, CS-1 and CS-3 were debriefed by U.S. law enforcement. They indicated that the two individuals referenced above had expressed satisfaction with the condition of the vessel and intended to show the video of it to other co-conspirators. CS-1 and CS-3 told law enforcement that, later that day, they would be

meeting these individuals and others at the Hotel Bahia in Cartagena.

19. On the afternoon of October 21, 2011, CS-1 and CS-3 met with these individuals and other co-conspirators at the Hotel Bahia as agreed, and provided them with additional details regarding the vessel and the cocaine smuggling venture. Some of the people present at the meeting wanted an escort onboard the vessel to guarantee the cocaine arrived in Mexico. CS-3 refused, arguing that he was a serious businessman who, having shown them the vessel, was trustworthy.

20. After the meeting of October 21, one of the investors contacted Urdinola and advised him that the vessel and the investor's 200 kilograms of cocaine was ready to be shipped from Colombia to Mexico, for eventual importation into the United States. During that conversation, Urdinola and the investor agreed to become equal partners and split the investment. Urdinola indicated he would be traveling to Cartagena the following week, at which time the two would further discuss the deal.

21. Additional meetings were held on October 26, 2011, between CS-1, CS-3, the investors and other co-conspirators. During one of the meetings, CS-3 was given a cellular telephone and instructed to call one of the co-conspirators when the cocaine shipment reached Mexico. Another co-conspirator was instructed to deliver $25,000 in Colombian pesos to CS-1 and CS-3 for transportation expenses. Upon receiving the money, CS-1 and CS-3 turned the money over to U.S. law enforcement agents.

22. As a result of the above meetings, Colombian law enforcement began lawful, judicially-authorized interceptions of the telephones used by one of the co-conspirators. In these intercepted conversations, the above referenced co-conspirators were heard discussing the final preparations for the delivery of the cocaine to the individuals who would deliver it to the vessel

for shipment, as well as the delivery of the funds needed to support the venture. The vessel was scheduled to depart on October 28, 2011.

23. On October 28, 2011, CS-1 met with two co-conspirators in Cartagena to receive the cocaine load as previously arranged. CS-1 met these individuals at a gas station and provided the keys to his vehicle to one of the co-conspirators. Ultimately, the vehicle was driven to an auto repair shop in the city and left for Martinez-Meyer, who loaded cocaine-filled duffel bags into the car. CS-1 later retrieved the cocaine and turned it over to an undercover Colombian law enforcement officer. Conversations among some of the co-conspirators obtained via subsequent judicially-authorized interceptions confirmed that Urdinola and his co-conspirators believed the cocaine had been delivered as planned.

24. Instead of loading the cocaine onto the boat at Astivik port, as he had led members of the conspiracy to believe he would do, CS-1 and the undercover Colombian law enforcement officer turned over the cocaine to other Colombian agents, who subsequently transferred it to the DEA. The contents of the duffel bags were tested, yielding a positive result for cocaine. The duffel bags contained approximately 300 kilograms of cocaine arranged in 295 bricks. The bricks were variously marked with different symbols: "RX," "Pony 1," and an arrow. Subsequent to the seizure of the cocaine, several of the co-conspirators involved in the transaction confirmed that the bricks of cocaine Martinez-Meyer provided to CS-1 was the same load Urdinola and his associates had agreed to smuggle onboard the vessel docked at Astivik port as described above.

25. After the seizure of the cocaine, CS-3 continued communicating with some of his associates to have them believe that the drug transaction had proceeded as planned. Based on the lawful interception of these calls, members of the conspiracy believed that CS-3 had loaded the

drugs onto the boat and the vessel had departed Cartagena as planned.

26. Following several days without hearing from CS-1 or CS-3, Urdinola and his associates began to suspect that one or all of the CSs had stolen the cocaine shipment. Lawful, judicially-authorized interceptions of a co-conspirator's telephone revealed calls between other co-conspirators expressing this concern. The calls increased in frequency and the co-conspirators became increasingly alarmed as the discussions focused on how to locate CS-1.

27. By October 31, 2011, Urdinola, and some of his associates focused on finding out what happened to the missing 300 kilograms of cocaine. They did so by trying to locate the CSs. As part of this search operation, Urdinola and others tried to determine the true identity of CS-1, which Urdinola and others suspected CS-1 had misrepresented.

28. Sometime during this time period, Margfoy was contacted by Urdinola, who asked Margfoy to return to Cartagena, ostensibly, to receive his commission for making the introduction to the confidential sources and arranging the drug deal. Margfoy and others returned to Cartagena, where they were met by approximately ten armed men, including Urdinola and Simancas. One of the men explained to Margfoy that CS-1 and CS-2 had stolen the cocaine, as well as $25,000 in Colombian pesos in transportation money, which had previously been provided. Margfoy was then questioned about his relationship with the confidential sources and was asked to provide as much information as he could about them, including their names and addresses. One co-conspirator was instructed to retrieve CS-2's Facebook page, and once it was retrieved, Urdinola began taking photographs of it. Urdinola advised one of his co-conspirators that Urdinola held him responsible for the lost money and missing cocaine.

29. As part of the ruse to locate the missing confidential sources, Margfoy advised a co-conspirator that he, Margfoy, knew a drug broker who had previously negotiated a drug deal

7

with CS-1 on behalf of the DTO. Margfoy and Simancas then arranged a meeting with this broker in Barranquilla. Margfoy and Simancas advised the broker that they were seeking to transport cocaine to Puerto Rico.

30. The broker subsequently made contact with CS-1 and advised CS-1 that he was seeking cocaine transportation services. CS-1 advised that he would only meet in Bogota. On November 4, 2011, Simancas and the broker travelled to Bogota, where they met with CS-1 and CS-2. CS-1 and CS-2 offered the same drug deal to Simancas and the broker as had been made to several co-conspirators in October 2011 as described above. On November 22, 2011, Simancas inspected the same vessel previously procured by CS-1 and CS-2 at Astivik port, which CS-1 and CS-2 represented could transport cocaine from Colombia to Mexico, for ultimate distribution into the United States.

31. On November 25, 2011, CS-1 and CS-3 met with Simancas at a hotel in Bogota. CS-3 was introduced as the captain of the boat. The meeting lasted several hours. Simancas stated he had the money ready for the shipment and made arrangements to meet later that evening.

32. At approximately 6:00 p.m. on November 25, 2011, CS-1 met with Simancas at a supermarket in Bogota. At that meeting, Simancas acknowledged that he worked for the DTO and demanded the return of the drugs, or the monetary value of the drugs, from the October 2011 transaction. CS-1, although frightened, managed to contact CS-2. CS-1 told CS-2 what Simancas had said, and told CS-2 that he feared he would be killed. CS-1 asked CS-2 to call Colombian law enforcement authorities for assistance. As CS-1 went outside to speak with Simancas, he was murdered by one of Urdinola's employees.

33. The investigation revealed that following the murder of CS-1, Urdinola and a co-

conspirator met in Bogota, where Urdinola advised him that he had been contracted to kill CS-1.

34. In February 2012, several co-conspirators were arrested by Colombia law enforcement officers on unrelated domestic charges and were incarcerated in Colombia. Urdinola was arrested on Colombian charges in February 2013. The investigation reveled that all of the above-referenced co-conspirators, while incarcerated, discussed with Urdinola on several occasions how to mislead law enforcement regarding the narcotics shipment of October 2011 and the murder of CS-1.

### III. Identification

35. Hector Mario Urdinola Alavarez is a citizen of Colombia, born on August 26, 1982, in Cali, Colombia. Urdinola has Colombian cedula number 16.844.641. Attached to this affidavit, as Exhibit E, is a copy of Urdinola's cedula. Several co-conspirators referenced in this affidavit have examined the photograph in Exhibit E and confirmed that the person in the photographs is Hector Mario Urdinola Alavarez, the person whose criminal conduct is described in this affidavit and who has been charged in this case.

36. In addition, law enforcement agents in Colombia have confirmed that he person in Exhibit E is Urdinola, the person recently arrested in Colombia on the provisional arrest warrant issued in this matter.

_____
PETER J. MAYNARD
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn and subscribed before me this ____12____ day of ___JAN___, 2015

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

> Certified to be a true and correct copy of the document on file
> Steven M. Larimore, Clerk,
> U.S. District Court
> Southern District of Florida
>
> By _____
>                     Deputy Clerk
> Date _____

# Exhibit E

**United States District Court**
Southern District of Florida

Case Number: _____

# SUPPLEMENTAL ATTACHMENT(S)

Please refer to supplemental paper "court file" in the division where the Judge is chambered. These attachments must <u>not</u> be placed in the "chron file".

☐ **NOT SCANNED**

    ☐ Due to Poor Quality

    ☐ Bound Extradition Papers

    ☒ Photographs

    ☐ Surety Bond (Original or Letter of Understanding)

    ☐ CD, DVD, VHS Tape, Cassette Tape

    ☐ Other: _____

☐ **SCANNED**

    ☐ But Poor Quality

    ☐ Habeas Cases (State Court Record/Transcript)

Date: _____